VENERA SWAISS ex rel. HAZEM
SWAISS (deceased husband),

    Plaintiff,

        v.

NANCY A. BERRYHILL,
Acting Commissioner of
Social Security,

    Defendant.

No. 16 C 2536

Judge Thomas M. Durkin

## MEMORANDUM OPINION AND ORDER

Venera Swaiss ("Plaintiff") brings this action on behalf of her deceased husband, Hazem Swaiss ("Swaiss"), pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the final decision of the Commissioner of Social Security denying Swaiss's claim for disability benefits and supplemental security income. Plaintiff seeks an award of benefits, or in the alternative, remand to the Commissioner. The Commissioner also seeks summary judgment in her favor. R. 24. For the following reasons, the Commissioner's decision is reversed and remanded for further proceedings consistent with this opinion and order.

## Legal Standard

Judicial review of a final decision of the Social Security Administration is generally deferential. The Social Security Act requires the court to sustain the administrative law judge's ("ALJ") findings if they are supported by substantial

evidence. *See* 42 U.S.C. § 405(g). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court should review the entire administrative record, but must "not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the [ALJ]." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). "However, this does not mean that [the court] will simply rubber-stamp the [ALJ's] decision without a critical review of the evidence." *Id.* A decision may be reversed if the ALJ's findings "are not supported by substantial evidence or if the ALJ applied an erroneous legal standard." *Id.* In addition, the court will reverse if the ALJ does not "explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). "Although a written evaluation of each piece of evidence or testimony is not required, neither may the ALJ select and discuss only that evidence that favors his ultimate conclusion." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994); *see Scrogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014) ("This 'sound-bite' approach to record evaluation is an impermissible methodology for evaluating the evidence."). Additionally, the ALJ "has a duty to fully develop the record before drawing any conclusions," *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007), and deference in review is "lessened . . . where the ALJ's findings rest on an error of fact or logic." *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014). In oft-quoted words, the Seventh Circuit has said that the ALJ "must build an accurate and logical bridge

from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. When the ALJ has satisfied these requirements, the responsibility for deciding whether the claimant is disabled falls on the Social Security Administration, and, if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled," the ALJ's decision must be affirmed. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990).

## Background

### I.    Procedural History

On January 19, 2010, Swaiss filed applications for Disability Insurance Benefits and Supplemental Security Income. R. 14 at 2. The Commissioner of Social Security denied these applications. *Id.* The Administrative Law Judge (ALJ) subsequently upheld this decision. *Id.* Swaiss passed away on Feburary 13, 2013.

Plaintiff subsequently filed a complaint in this district. *Id.* Magistrate Judge Brown reversed the ALJ's decision and remanded the case to the Commissioner of Social Security. *See Swaiss v. Colvin*, 2015 WL 231473 (N.D. Ill. Jan. 16, 2015).

Upon remand, the ALJ denied Plaintiff's claims on November 12, 2015. R. 7-13 at 2. On February 24, 2016, Plaintiff filed the instant complaint. R. 1.

### II.    Factual History

Until his death on February 13, 2013, plaintiff Swaiss allegedly suffered from a variety of health issues including, but not limited to, chest pain, peripheral vascular disease, leg pain and spasms, sinus tacychardia, diabetes, neuropathy, and edema. R. 14 at 3-5. The ALJ found that Swaiss had severe impairments of hypertension, diabetes mellitus, peripheral vascular disease, generalized

osteoarthritis, restless leg syndrome, and peripheral neuropathy. R. 7-13 at 8. Swaiss testified that, starting in 2008, he became unable to work. R. 14 at 5. Swaiss underwent heart surgeries in May and June 2009. R. 7-13 at 11. Swaiss testified that his medical condition prevented him from sitting for more than 45 minutes, standing for more than 20 minutes, walking for more than one block, repeatedly lifting more than ten pounds, participating in activities with his children, and completing household chores. R. 14 at 5. Over the years, Swaiss's condition fluctuated. R. 7-13 at 753. For example, Swaiss denied having chest pain at his September 2011 doctor's appointment. *Id.* at 754. However, he reported non-cardiac chest pain at his February 2012 appointment. *Id.* Other records from that appointment indicate that Swaiss's arteriosclerotic heart disease and peripheral vascular disease were also stable. *Id.* In November 2012, professionals at a cardiovascular clinic noted that Swaiss's condition was stable. On February 13, 2013, Swaiss was admitted into the emergency room and died not long after. As per the death certificate, the causes of death were hypertensive arteriosclerotic cardiovascular disease, quetiapine toxicity, and diabetes mellitus. *Id.*

## Analysis

In order to determine whether an individual is disabled, an ALJ must follow the five-step analysis provided by 20 C.F.R. § 404.1520(a)(4). At step one, if the ALJ determines that the claimant is "doing substantial gainful activity," then the claimant is not disabled and no further analysis is necessary. If the claimant is not engaged in gainful activity, at step two, the ALJ must determine whether the

4

claimant has a "severe" impairment or combination of impairments. If the ALJ finds that the claimant has such a severe impairment, and the impairment is one provided for in the Social Security regulation listings, then at step three, the ALJ must find that the claimant is disabled. If the ALJ finds that the impairment is not in the listings, then at step four, the ALJ must assess the "residual functional capacity" ("RFC") the claimant continues to possess despite the claimant's impairment. If the claimant's RFC enables the claimant to continue his or her "past relevant work," then the ALJ must find that the claimant is not disabled. But if the claimant cannot perform past relevant work, at step five, the ALJ must determine whether the claimant "can make an adjustment to other work." If the claimant cannot make such an adjustment, then the claimant is disabled.

Here, Swaiss does not challenge the ALJ's decision at steps one, two, or three. Rather, Swaiss argues that the ALJ erred at steps four and five.

## I. Step Four: Swaiss's RFC

Plaintiff asserts that the ALJ improperly assessed Swaiss's residual functional capacity by (1) rejecting her testimony, (2) failing to properly account for Swaiss's chest pain, and (3) failing to account for Swaiss's alleged need to periodically elevate his legs. R. 14 at 8.

### A. ALJ's Rejection of Plaintiff's Testimony

Plaintiff asserts that the ALJ erred by rejecting her testimony regarding Swaiss's condition. R. 14 at 13. The ALJ perceived Plaintiff's testimony as inconsistent and accordingly rejected it.

An ALJ is entitled to determine whether a witness's testimony is credible. *See Shideler v. Astrue*, 688 F.3d 306, 310-11 (7th Cir. 2012). A court should "uphold an ALJ's credibility determination if the ALJ gave specific reasons for the finding that are supported by substantial evidence." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009).

The ALJ's rejection of Plaintiff's testimony was sufficiently supported. The ALJ fully detailed why she did not find Plaintiff's testimony to be credible, identifying a number of inconsistences between her testimony and the evidence. R. 7-13 at 756. For example, Plaintiff testified that pain medication did not improve her husband's condition. *Id.* This testimony is contradicted by medical records, which demonstrate that the medication generally caused her husband's condition to improve. *Id.* In addition, Plaintiff testified that Swaiss did not work, but that testimony is contrary to evidence in the record that Swaiss worked up to 72 hours per week in a restaurant after the alleged onset date of his disability. *Id.* Furthermore, Plaintiff testified that her husband never worked as a cook, but Swaiss himself told healthcare providers that he did. *Id.* In light of these inconsistencies, the ALJ's rationale for discrediting Plaintiff's testimony is apparent. Consequently, the ALJ appropriately used her discretion in finding Plaintiff's testimony not credible, and that credibility determination is not a basis to reverse the ALJ's decision. *See Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010) ("[W]e reverse credibility determinations only if they are patently wrong.").

## B. ALJ's Assessment of Swaiss's Chest Pain

Plaintiff also argues that the ALJ erred in her calculation of Swaiss's RFC by failing to account for certain physical restrictions. Specifically, Plaintiff argues that the ALJ failed to consider the following facts:

> Swaiss testified that he could lift ten pounds at one time but that he could not continuously lift that amount of weight without suffering chest pain. He had difficulty even pushing a grocery cart due to chest pain. Chest pain restricted his ability to lift overhead. In the Adult Function Report that he completed, Mr. Swaiss averred that he was unable to perform yard work due to chest pain and that he had difficulty carrying items such as a bag of groceries. At the 2015 hearing, [Plaintiff] testified that Mr. Swaiss frequently suffered chest pains and that he avoided lifting as a result. He had trouble lifting even a gallon of milk.

R. 14 at 11 (internal record citations omitted). But the ALJ acknowledged all of these facts. R. 7-13 at 752, 755. As Plaintiff concedes, the ALJ's decision was not a result of ignoring these facts, but rather weighing them against the other anecdotal and medical evidence in the record. As Plaintiff herself explains in her brief, the ALJ relied on

> evidence . . . that Mr. Swaiss'[s] chest pain improved with the placement of stents and that Mr. Swaiss'[s] chest pain was "generally" stable until the date of his death. The ALJ further found that [Plaintiff's] descriptions of Mr. Swaiss'[s] chest pain were belied by evidence that reflected that Mr. Swaiss worked up to 72 hours a week subsequent to the alleged disability onset date.

R. 14 at 11-12. Clearly, the ALJ decided that the medical reports of Swaiss's lifting ability and the general stability of his heart condition were more credible and persuasive than the Swaisses' testimony. Plaintiff's testimony undermined her

credibility for the reasons already explained. And Swaiss's own testimony was undermined by evidence that he was able to work 72 hours per week, evidence that his initial claim that he stopped working due to his disability was false, and that he actually stopped working because he was not being paid. R. 7-13 at 755-56. These inconsistencies in the Swaisses' testimony make it reasonable for the ALJ to have relied on the contrary medical reports in determining Swaiss's RFC.

Plaintiff also argues that the ALJ failed to address that fact that Swaiss's heart condition contributed to his death in determining his RFC. It is true that hypertensive arteriosclerotic cardiovascular disease contributed to Swaiss's death. R. 7-13 at 12. But as the ALJ noted, quetiapine toxicity and diabetes mellitus also contributed to his death. *Id.* In fact, the death certificate describes Swaiss's death as a case of a "person with heart disease [who] took too many pills." *Id.* at 754. Plaintiff also cites an abnormal electrocardiogram from the day of Swaiss's death as evidence that his heart condition was more serious than is reflected in the ALJ's RFC. But of course the result of the electrocardiogram from that day was at least partially the result of the fact that Swaiss overdosed on his medication. In light of the overdose, Swaiss's condition on the day he died cannot be taken as evidence of the general condition of his health at that time. Thus, Swaiss's cause of death and the electrocardiogram from the day he died, are not bases to conclude that the ALJ underestimated the severity of Swaiss's chest pain condition.

### C. ALJ's Assessment of Swaiss's Need to Elevate His Legs

Swaiss also argues that the ALJ's decision should be reversed because the ALJ failed to articulate why she did not include Swaiss's alleged need to periodically elevate his legs as a functional limitation in assessing his RFC. R. 14 at 9. But the only evidence in the record that Swaiss needed to elevate his legs was Plaintiff's testimony. As discussed, the ALJ's decision to discount Plaintiff's testimony was justified by multiple inconsistencies between her testimony and the record.

Plaintiff also argues that Swaiss suffered from edema (or swelling) in his legs, and that leg elevation is frequently a treatment for that condition. Plaintiff, however, cites only two places in the record that mention edema. A record from June 2012 notes that Swaiss "complain[ed] of one month of lower leg swelling . . . which was somewhat better in the [morning]." R. 7-18 at 1032. The June 2012 record does not prescribe any treatment for that complaint specifically. *Id.* at 1033. A record from October 2012 also noted "trace," or minimal, edema. *Id.* at 1030. Again, no treatment was prescribed for this condition. *Id.* at 1031. Some evidence of minimal edema is not a basis to find that the ALJ was required to consider whether Swaiss had a need to elevate his legs in determining his RFC.

To the extent that there is evidence that Swaiss needed to elevate his legs and suffered from edema, the ALJ's assessment of the condition of Swaiss's legs generally sufficed to account for these symptoms. It was entirely reasonable for the ALJ to discuss Swaiss's leg conditions in the same manner as the medical reports;

namely by focusing on the other—apparently more serious—conditions affecting his legs such as peripheral vascular disease, generalized osteoarthritis, restless leg syndrome, and peripheral neuropathy. Plaintiff does not argue that the ALJ failed to sufficiently address these conditions. Nor could she, as the ALJ's decision contains a detailed assessment of these conditions and their effect on Swaiss's RFC. As the Seventh Circuit has held, "the expression of a claimant's RFC need not be articulated function-by-function; a narrative discussion of a claimant's symptoms and medical source opinions is sufficient." *Knox v. Astrue*, 327 Fed. App'x 652, 657 (7th Cir. 2009). As in *Knox*, the ALJ here "satisfied the discussion requirements by analyzing the objective medical evidence, [relevant] testimony (and credibility), and other evidence. . . . The ALJ need not provide a written evaluation of every piece of evidence, but need only 'minimally articulate his reasoning so as to connect the evidence to his conclusions." *Id.* at 657-58. The ALJ did that with respect to Swaiss's leg conditions, so that aspect of the ALJ's decision is not a basis for reversal.

## II.  Step Four continued: Past Work

The ALJ determined that Swaiss retained a RFC to perform "light work" (as defined in the Social Security regulations), with certain added restrictions. The ALJ was then required to determine whether Swaiss's RFC allowed him to continue performing to the level of his past work as the owner of a cell phone store and later a White Hen convenience store. In order to make this determination, the ALJ required evidence of the duties Swaiss performed in his past work. The ALJ

considered Swaiss's testimony on this topic, as well as that of a vocational expert. The vocational expert, however, did not testify about the "duties" required to perform the job of "store *owner*," but rather testified about the "exertional level" (i.e., light, medium, sedentary) required to perform the job of a "store *manager*." The vocational expert's testimony on this issue proceeded as follows:

> ALJ: Okay. And have you looked at the work documents in the file?
> VE: Yes.
> ALJ: Okay. Now getting to my question. In your opinion did the claimant have past work as assistant retail manager?
> VE: Well, I've assigned was [sic] the retail manager but when you said assistant, the – I'm looking at exhibit 7E, which is [Swaiss's] work history report. And all of the jobs listed there are owner. . . . I don't know where the assistant part comes [from]. I was going to rate it as something else in the [Dictionary of Occupational Titles ("DOT")].
> ALJ: Okay. So could you give us your opinion as to what the claimant's past work is?
> VE: Well, for owner, the DOT doesn't talk about ownership so the closest I could get would be store manager. . . . And that's 185.167-046, light in the DOT, skilled work, SVP 7. Now the various jobs listed [in Swaiss's work history], the five of them, one from May, '06, to March, '08, was rated at medium. The rest were rated at light.
> ALJ: So all of them are store manager with the same DOT code?
> VE: Yeah.
> ALJ: And they're all per the DOT light, SVP 7, is that what you're saying?
> VE: Yes, that's what I'm saying. That's what store owner would –
> ALJ: Okay. And so then what is – could you clarify your testimony as rated as medium, what do you mean by that?
> VE: Well, no, in the description of the work that the claimant provided on page 5, of exhibit 7E. This is the job

at, I guess, White Hen, and he said he had to lift 50 pounds occasionally, and 25 pounds frequently which puts it at the medium exertional level.

ALJ: Okay. And so what you're saying it's light according to the DOT but medium as performed, is that what you're saying?

VE: For that particular job.

ALJ: For that one – from '06, to '08?

VE: Yes.

ALJ: All right. And the other ones?

VE: The next one listed [is] he sold cell phones. . . . That was at light.

ALJ: Performed at light?

VE: Performed at light, yes.

ALJ: And it was at this – also a store manager, 185.167-046?

VE: All of them, yes ma'am.

ALJ: All performed at light, okay. Okay.

*     *     *

ALJ: Okay. So – all right. So let's assume that we have an individual who can occasionally who can perform work at the light exertional level, in other words, if the individual can lift and carry 20 pounds occasionally, 10 pounds frequently.

The individual can stand and or walk about six hours in an eight hour workday, and sit about six hours in an eight hour workday. The individual can push and pull to the same extent as they can lift and carry.

Now the individual can occasionally climb ramps and stairs, never climb ladders, ropes or scaffolds. The individual can occasionally balance, occasionally stoop, occasionally kneel, occasionally crouch, and occasionally crawl. The individual should – excuse me.

The individual cannot work directly with hazardous machines with moving mechanical parts, and cannot work in high exposed places. Could an individual with this functional capacity perform any of claimant's past work?

VE: Just checking on the posturals [sic], Your Honor. Yes, the cell phone store.

ALJ: And the -- would that be performed – could – you say that the individual with this functional capacity would be able to perform the cell phone store job?

VE: Yes.

12

ALJ: And would that be as generally performed, or as actually performed, or –
VE: Well, according to how he described it. He didn't have to – he didn't rate climbing or stooping at all. One hour for kneeling, two hours for crouching, two hours for crawling, so that would be within occasional.
ALJ: Okay. So in terms of my question, could then – the individual perform the cell phone –
VE: Per DOT, yes.
ALJ: Per DOT, and as performed?
VE: Yes.
ALJ: The cell phone store manager job?
VE: Yes.

R. 7-13 at 823-26. On the basis of this testimony, the ALJ found that Swaiss was

capable of performing past relevant work because:

> [t]he vocation expert testified that work as a store manager (DOT 185.167-046) is skilled work generally performed at the light exertional level and performed by [Swaiss] at the light and medium exertional levels. The vocational expert testified that the claimant performed the job of store manager of a convenience store at the medium exertional level and the job of store manager of a cell phone store at the light exertional level. The vocational expert also testified that an individual with the above residual functional capacity could perform the claimant's past work as a store manager as generally performed and as he actually performed it at the phone store.

R. 7-13 at 757.

The Commissioner argues that it was permissible for the ALJ to rely on the

vocational expert's testimony to determine whether Swaiss could still perform his

past work because the vocational expert "testified that she reviewed the work

documents in the file and found that [Swaiss's] work was equivalent to that of a

store manager." R. 25 at 8. But the ALJ failed to elicit the details of the analysis

13

underlying the vocational expert's testimony. Rather, the vocational expert's testimony, and the ALJ's questions, focused on the fact that both "store managers" and "store owners" are can perform work at the "light" exertional level. The ALJ expressly relied on the vocational expert's determination that the work of "store owner" and "store manager" were equivalent. This reliance was impermissible because the ALJ failed to elicit testimony or make findings concerning the specific duties of either job. *See Smith v. Barnhart*, 388 F.3d 251, 252 (7th Cir. 2004). (holding that analysis of whether a claimant can perform past relevant work must rest on "whether [the claimant] could perform the duties of the specific jobs that she had held"). The vocational expert did not testify as to the "duties" of a "store manager" and whether they matched the "duties" of a "store owner." Absent this analysis, the ALJ's decision rests on the fact that Swaiss worked at medium and light exertional levels in his "store owner" positions, and "store managers" are required to perform at the light exertional level. But the Seventh Circuit has held that an ALJ must consider the particular *duties* required by a claimant's past work when determining whether a claimant can still perform that work. The ALJ may not simply compare the claimant's RFC *exertional level* to the exertional level associated with the claimant's past work (i.e., "medium," "light," or "sedentary). *See id.* ("The administrative law judge's error, which requires us to remand the case to the Social Security Administration, lay in equating [the claimant's] past relevant work to sedentary work in general. [The ALJ] should have considered not whether [the claimant] could perform some type of sedentary work but whether [the

claimant] could perform the duties of the specific jobs that [the claimant] had held."). Since the ALJ's decision regarding Swaiss's ability to accomplish past work did not rest on an analysis of the specific duties of the relevant jobs, it must be reversed.

## II.    Step Five: Other Work

As an alternative to her finding that Swaiss could continue to perform his past work, the ALJ also found that Swaiss could perform other work in the national economy, namely the jobs of "office helper," "information clerk," or "counter clerk." R. 7-13 at 758. Plaintiff argues that this finding was erroneous because the ALJ failed to properly determine that these jobs "exist in significant numbers in the national economy," as is required by 20 C.F.R. § 404.1560(c)(1).

As was the case here, ALJs often rely on the testimony of vocational experts to determine whether other jobs exist in the national economy that could be performed by the claimant. The social security regulations require ALJs "to ask whether a vocational expert's evidence 'conflicts with information provided in the DOT' before relying on that evidence to support a determination of nondisability." *Overman v. Astrue*, 546 F.3d 456, 462-63 (7th Cir. 2008) (quoting SSR 00-4p). Even if a vocational expert denies any conflicts, as she did here, an ALJ must still inquire into and obtain a reasonable explanation for any apparent conflicts between the vocational expert's testimony and the DOT. *Id.*; *Prochaska v. Barnhart*, 454 F.3d 731, 735 (7th Cir. 2006).

The ALJ failed to obtain a reasonable explanation for the vocational expert's testimony in this case. After hearing the vocational expert's testimony concerning the jobs Swaiss could perform, the ALJ and the vocational expert had the following exchange concerning the expert's analysis:

> ALJ: And is your testimony consistent with the Dictionary of Occupational Titles?
> VE: Yes, Judge.
> ALJ: And in terms of the number of these jobs that you cited, where do you obtain your information from to [sic] give this – these – this opinion?
> VE: I go to the U.S. Department of Labor, Bureau of Labor Statistics, Occupational Employment Statistics. I get U.S. general statistics first, and then I go to the various states. The information that's provided on those – on that website also includes SOC numbers which is standard occupational classification numbers.
>
> I look for specific SOC codes because of specific jobs that I used very much over the course of my work, and so that I know [sic] the DOT numbers, and I know the SOC codes. And so I compare what the SOC codes are for the U.S. economy, and I look at state economy [sic].
>
> And then based on my best experience, I've been doing this for over 30 years as a vocational rehabilitation consultant. I take my best estimate of what I think the job numbers might be for the region.

R. 7-13 at 826-27. Notably, the vocational expert did not provide, and the ALJ did not ask for, the SOC numbers the vocational expert used to reach her determination regarding the availability of the jobs Swaiss could perform. Nor did the vocational expert explain how her analysis was consistent with the DOT. Her conclusory assertion that her analysis was consistent with the DOT is not a reasonable explanation of the basis for her conclusion.

After the ALJ had questioned the vocational expert, Swaiss's counsel sought

more specific data supporting for the vocational expert's analysis, but none was

forthcoming. The vocational expert's testimony continued as follows:

> Atty: How do we know that the DOT numbers and the SOC numbers conform to the same requirements, the same job?
> VE: That's based on my experience. I've used the same jobs or tend to use the same jobs and DOT numbers a lot and that's because I know them. That, and they're very standard kinds of jobs.
> They're not esoteric to a specific region like the northwest, or the south or anything like that. These are standard jobs that I'll find all over.
> Atty: And when you say that you've used the jobs in the past, can you . . . . use them in . . . . testimony, in placing clients, or –
> A: Both.
> Atty: Okay. And the SOC numbers, because they don't conform with the DOT numbers, can you just talk about your methodology about how you get to a job number from the SOC numbers?
> A: It's my experience again. I mentioned that. I –
> Atty: Okay. Is there a particular methodology that you use, or –
> A: My – well, my methodology is this whole list that I gave you from the U.S. Department of Labor, and then into the specific employment market. I've been . . . . I'm out in the field a lot. . . . And I see what jobs exist, and I know what are common jobs. And so again it's based on my best experience of – and my best estimate of what the jobs might be. . . . There is . . . . no specific step from the SOC to the DOT, if that's what you're trying to get at.
> * * *
> Atty: Can you provide me any sort of labor studies or materials that you relied on in transferring the SOC numbers to DOT –
> VE: No.
> Atty: – job numbers? Is – can you tell me why you can't provide me anything with it?
> VE: I don't have a labor market study.

Atty: Okay. Did you rely on any sort of formula, or anything like that?

VE:     No, it's my best experience and my best estimate.

R. 7-13 at 829-31. While a vocational expert is entitled to rely on her expertise, she must explain her reasoning, or else an ALJ's decision based on her testimony cannot be said to be supported by "substantial evidence," as is required by the regulations. *See Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002) ("Evidence is not 'substantial' if vital testimony has been conjured out of whole cloth."); *see also Hill v. Colvin*, 807 F.3d 862, 870 (7th Cir. 2015) (Posner, J. concurring) (noting "a persistent, serious, and often ignored deficiency in opinions by the administrative law judges of the Social Security Administration denying social security disability benefits . . . . concern[ing] testimony by vocational experts employed by the Administration concerning the number and types of jobs that an applicant deemed not to be totally disabled could perform, and the evaluation of that testimony by administrative law judges."). Without citing the specific SOC numbers she relied upon, and without testifying as why she matched certain SOC numbers to certain DOT numbers, there is no way for the ALJ (let alone this Court or the claimant's counsel) to determine whether the vocational expert's opinion was reasonable. This failure is all the more mysterious because as the ALJ herself noted, this information is readily available on the internet. R. 7-13 at 831 ("Counsel, you can look that up, that's easy, Google it. . . . That's a very well known site."). But without knowing what SOC numbers the vocational expert referenced, knowledge of the site itself is useless. The vocational expert testified that she choose specific SOC numbers that

she believed correlated to the relevant DOT numbers, based on her own experience. That information is not available on any website; rather, it is locked in the vocational expert's head. Swaiss's counsel asked for it, and was stonewalled by both the vocational expert and the ALJ. The ALJ's decision also must be reversed for this reason.

## Conclusion

For the foregoing reasons, the Commissioner's decision is reversed and remanded for further proceedings consistent with this opinion, and the Commissioner's motion, R. 24, is denied.

ENTERED:

_Thomas M Durkin_

Honorable Thomas M. Durkin
United States District Judge

Dated:  July 10, 2017